UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUSAN LYNNE JARVIS-ORR,

        Plaintiffs,

vs.

TOWNSHIP OF HARTFORD, *et al.*,

        Defendants.
_____/

Case No. 1:11-cv-1066

Hon. Robert J. Jonker

**REPORT AND RECOMMENDATION**

This matter is now before the court on *pro se* plaintiff's second motion for preliminary injunction (docket no. 5) and motion for injunctive relief (docketed as "motion for order") (docket no. 28).

    **I.**    **Background**

    **A.**    **Sewage issues involving Van Buren County**

This dispute involves plaintiff's B&J Mobile Home Park (sometimes referred to as the "mobile home park") and her disputes with various local authorities regulating the mobile home park. Compl. at p. 2 (docket no. 1). The background for this dispute appears in the numerous documents attached to the *pro se* plaintiff's complaint. The disputes began as early as August 2, 2010, when the Van Buren/Cass County District Public Health Department ("County Health Department") notified plaintiff via certified mail of an "Order to Comply" which arose from "the discharge of inadequately treated sewage from an unlawful septic system serving the property located at Lot #1 in B & J Mobile Home Park." County Health Department letter (Aug. 2, 2010) (docket no. 1-1 at p. 19). The County went on to state "*Untreated or inadequately treated human*

*wastes can promote the transmission of amebiasis, cholera, encephalitis, meningitis, hepatitis, poliomyelitis, salmonellosis, shigellosis and typhoid fever.*" *Id.* (emphasis in original). The order required plaintiff to repair "the present sewage disposal system with a properly constructed system" within 30 days, provided plaintiff with a sanitation permit application, and advised her that a representative would inspect the sewage system upon receipt of her application. *Id.* The letter further advised plaintiff that if she failed to obey the order the matter would be referred to the Van Buren County Prosecuting Attorney to initiate proceedings in the Circuit Court for enforcement of the order. *Id.*

In a letter dated August 12, 2010, the County Health Department advised plaintiff that "[s]ince the allotted time has passed for the noted deficiencies to be repaired," certain trailers were unfit for human habitation under the Van Buren/Cass County Housing Regulations and had been condemned as of August 11, 2010, namely Lots 0, 1, 2, 3, 4 and 5. County Health Department letter (Aug. 12, 2010) (docket no. 1-1 at p. 20). The County Health Department ordered the residences to be vacated within two weeks upon receipt of the letter and remain unoccupied "until this office has approved all corrections to the deficiencies." *Id.* Then, in a letter dated August 31, 2010, the County Health Department advised plaintiff: that "this department has recognized the required corrections to your rental property," that "this department finds you in compliance with the Van Buren County Housing Regulations," and that the department's Public Health Sanitarian (Brian R. Lint) had "lifted the condemnation of this property." County Health Department letter (Aug. 31, 2010) (docket no. 1-1 at p. 21).

However, additional disputes arose the following summer. In June 14, 2011, when the Van Buren/Cass County District Public Health Department issued plaintiff an "Order to Abate

Imminent Danger" pursuant to § 2451(1) of Public Act 368 of 1978 (known as the Public Health Code) due to a finding "that an imminent danger to the public health exists through discharge of sewage to the ground surface at B & J Mobile Home Park owned by [plaintiff] on property located in Hartford Township, Van Buren County, [Michigan]." Order to Abate (docket no. 1-1 at p. 22). The order was based on the following specified findings:

> 1.   On June 13th, 2011, as well as on numerous previous occasions, personnel of the Van Buren/Cass Health Department have inspected the sewage disposal system and found that raw sewage was being discharged to the ground surface.
>
> 2.   There is a failure of the on-site sewage disposal system serving this mobile home park resulting in the discharge of sewage to the ground surface.
>
> 3.   The mobile home park has a capacity of ten (10) mobile homes and is occupied at or very near capacity. There are also a number of homes adjacent to the park. All of the residents in this area are being subjected to imminent public health hazard by the raw sewage on the ground surface.
>
> 4.   That area covered by the ponding of sewage is readily accessible by animals, the residents of the mobile home park and the public, including children.
>
> 5.   That the ponding of sewage represents a hazard to the health of the public and to the residents of the mobile home park through the exposure to pathogenic organisms found in that sewage.
>
> 6.   There have been numerous meetings, consultations and correspondence between the Van Buren/Cass Health Department, you and your representatives. To this date, the failure of the sewage system has not been remedied.

Order to Abate (docket no. 1-1 at p. 23).[1]

The attachments to plaintiff's complaint included a job invoice from Pro Plumbing Services, LLC, dated June 20, 2011, which charged plaintiff $115.00 for the following work: "found open sewer line in yard plus [sic] I had installed previously had been removed"; reinstalled [sic] plus

---

[1] The court notes that plaintiff has filed a similar action against the Van Buren Health Department, Van Buren County and two county officials related to the county's action with respect to the mobile home park. *See  Jarvis-Orr v. Van Buren County Health Department*, No. 1:11-cv-1067.

3

found leak had stopped"; "no other sewage in park"; and, "line was in area [sic]." Pro Plumbing Invoice (June 20, 2011) (docket no. 1-1 at p. 24). The complaint also included a statement from Baggett & Sons Plumbing Heating & A/C, dated June 23, 2011, which charged plaintiff $80.00 for the following work: "found no problem with septic tank or drain field everything flowing and draining to specs[,] no water above ground drains all open." Baggett & Sons Statement (June 23, 2011) (docket no. 1-1 at p. 25).

> **B.     Hartford Township's investigation and hearing as to whether Units 0, 1 and 2 are dangerous buildings under M.C.L. § 125.539.**

The present action arose when Hartford Township officials followed up on tenant complaints at the mobile home park. On July 29, 2011, Hartford Township issued a "Notice of Hearing for Order of Demolition." Notice of Hearing (July 29, 2011) (docket no. 1-1 at p. 2). The notice provided in pertinent part as follows:

> This document is to serve as Notice that a Hartford Township Building Inspector has found violations on the above listed property which render the trailer located thereon dangerous under the provisions of MCL 125.539, copies of which are attached.
>
> The trailer is dangerous under the law because it is unsafe or unlawful because it is a defective and dangerous building pursuant to the statutory definition of "Dangerous or Unsafe Building."
>
> PLEASE TAKE NOTICE that a hearing will be held on whether the building is dangerous or unsafe and should be demolished on:
>
> >     Time:   3:00 P.M.
> >     Date:   August 17, 2011
> >     Place:  Hartford Township Hall
> >             61310 CR 687, Hartford, Michigan
>
> TAKE FURTHER NOTICE  that you will have an opportunity to show cause at the hearing why the hearing officer shall not order the building be demolished, made safe or properly maintained.

Notice of Hearing (July 29, 2011) (docket no. 1-1 at p. 2).

On August 29, 2011, Cecil Derringer (a hearing officer appointed by Hartford Township Supervisor Ron Sefcik), issued three decisions after this hearing with respect to mobile homes identified as Units 0, 1, and 2. *See* Decision and Order (Unit 0) (docket no. 1-1 at pp. 5-8); Decision and Order (Unit 1) (docket no. 1-1 at pp. 9-13); Decision and Order (Unit 2) (docket no. 1-1 at pp. 14-18). Each Order listed the violations at the respective unit.

### 1. Unit 0

The Order for Unit 0 recited the testimony of Charles Moore, the duly appointed Building Official for Hartford Township, who testified that the unit was a dangerous structure as defined by M.C.L. § 125.539 for the following reasons: (1) Health Department worker George Friday requested Moore to follow up on complaints by tenants regarding sewage issues at the park; (2) the mobile home did not meet fire codes (no fire extinguisher); (3) there are no working smoke detectors in the mobile home; (4) there is no vent in the bathroom and the bathroom window does not open; (5) the kitchen has holes in the floor and it is possible to see the ground through the floor; (6) the mobile home has insect and rodent infestation; (7) the toilet does not flush properly; (8) the ground fault receptacle on the kitchen counter does not shut off; (9) "[t]he mobile home is in total disrepair, is not worth repairing and is unfit for human occupancy"; (10) the drain under the kitchen sink is held together with string; and (11) the furnace and water heater are very dirty, need to be cleaned and are fire hazards. Decision and Order (Unit 0). Yolanda Cruz, the occupant of Unit 0, testified that: (1) only one of the three electrical receptacles in the back bedroom will work at a time; (2) the kitchen electrical socket on the counter does not shut off; (3) there are no smoke detectors in the unit; (4) the toilet did not flush; and (5) the unit is infested with bugs and cockroaches. *Id.* Plaintiff testified as to Unit 0: (1) "That there are no structural defects in the mobile home and it

could be repaired. Mr. Dave Varney, Century Restoration, has inspected for structural defects."; (2) that she recently had an electrical contractor inspect the unit and no defects were noted; (3) she recently had a plumbing contractor inspect the septic tank and that it was also satisfactory. *Id.*

Based on this testimony, Hearing Officer Derringer determined that Unit 0 was a dangerous and unsafe building that should be demolished and removed for the following reasons: (1) the unit does not comply with the fire code (no fire extinguisher); (2) there are no working smoke detectors in the unit; (3) there needs to be a mechanical vent or operable window in the bathroom; (4) there are holes in the kitchen floor that need to be properly repaired and maintained so as not to allow rodents or insects access to the unit; (5) the unit is infested with roaches and rodents; (6) the water heater and furnace are full of dirt, lint and cobwebs and pose a fire risk to the structure; (7) the electrical system needs to be repaired so that every switch, receptacle and light fixture are in good working order; (8) the kitchen drain leaks; (9) the cabinets in both the bath and the kitchen are in need of repair; (10) the unit has been substantially destroyed by neglect and deterioration; and (11) the estimated cost of repair of the structure will be greater than the value of the mobile home. *Id.*

In his decision regarding Unit 0, Hearing Officer Derringer found that: proper notice had been given or waived by all interested parties; plaintiff appears to be the owner of the Unit; and "Based on the evidence submitted, the mobile home . . . commonly known as Unit 0, in Hartford Township, is hereby declared a dangerous and unsafe building as defined by statute (MCL 125.539) and shall be demolished or completely removed from the premises on or before October 1, 2011." *Id.*

### 2. Unit 1

The Order for Unit 1 recited the testimony of Charles Moore, who testified that the unit was a dangerous structure as defined by M.C.L. § 125.539 for the following reasons: (1) George Friday requested Moore to follow up on complaints by tenants regarding sewage issues at the park; (2) the mobile home did not meet fire codes (no fire extinguisher); (3) there are no working smoke detectors in the mobile home; (4) there is no lock on the side door of the unit; (5) the floors are in poor condition with actual holes where one can see the ground through the floor; (6) the gas has been shut off, the occupants are or were using unvented gas heaters, and the tenants were unable to get the gas company to open an account; (7) there is no hot water in the unit; (8) the cabinet bases, doors and drawer fronts in both the kitchen and bathroom are in poor condition requiring repair; (9) the floor registers are not properly attached to the heat ducts leaving gaps for cold air and pests to enter; (10) some windows have been repaired with plastic which has broken and admits both rain and cold air; and (11) the furnace and water heater are both very dirty and will require cleaning. Decision and Order (Unit 1). Jesus Cruz, a former occupant of Unit 1, testified that: (1) there was no natural gas service to the unit, resulting in no heat or hot water; (2) the windows leak; (3) raw sewage comes out of the ground near the unit; (4) the toilet did not flush properly; (5) no lawn care was provided; and (6) complaints of bugs and rodents. *Id.* Plaintiff testified as to Unit 1: (1) "That there are no structural defects in the mobile home and has a report from Century Restoration that it can be repaired."; (2) that she recently had an electrical contractor inspect the unit and he found no defects; (3) she recently had a plumbing contractor inspect the septic and drain filed and thta it was also satisfactory. *Id.* Based on this testimony, Hearing Officer Derringer determined that Unit ) was a dangerous and unsafe building: (1) the unit does not comply with the fire code (no fire

extinguisher); (2) there are no working smoke detectors in the unit; (3) there is no lock on the side door; (4) there are holes in the floor that need to be properly repaired and maintained so as not to allow rodents or insects access to the unit; (5) the unit must be properly served by a heating system and unvented gas heaters cannot be used; (6) there needs to be hot water in all of the fixtures in the unit; (7) the cabinet doors in the kitchen and bath need to be repaired; (8) the floor registers need to be attached to a working heat duct; (9) the windows need to be properly glazed and repaired so they do not leak; (10) the septic tank and drain field need to be pumped and placed in proper working condition; (11) the furnace and water heater need to be cleaned and verified by licensed contractors to be in proper and safe working order; (12) all electrical receptacles, switches and light fixtures need to be properly installed, complete with cover plates and globes. *Id.*

In his decision regarding Unit 1, Hearing Officer Derringer found that: proper notice had been given or waived by all interested parties; plaintiff appears to be the owner of the Unit; and that "Based on the evidence submitted, the mobile home . . . commonly known as Unit 1, in Hartford Township, is hereby declared a dangerous and unsafe building as defined by statute (MCL 125.539) but could be made safe and should be properly maintained if occupied." *Id.* Hearing Officer Derringer then ordered that Unit 1 "shall be demolished on or after October 1, 2011, unless the owner elects to properly repair and make the mobile home safe for human occupancy." *Id.* Derringer further ordered that "[i]f [plaintiff] refuses or neglects to comply with this Order by October 1, 2011, then these findings and this Order shall be filed with the Hartford Township Board of Trustees on October 6, 2011, and necessary action shall be taken as stated by the above pursuant to the Housing Law of Michigan." *Id.*

### 3. Unit 2

The Order for Unit 3 recited the testimony of Charles Moore, who testified that the unit was a dangerous structure as defined by M.C.L. § 125.539 for the following reasons: (1) George Friday requested Moore to follow up on complaints by tenants regarding sewage issues at the park; (2) the mobile home did not meet fire codes (no fire extinguisher); (3) there are no working smoke detectors in the mobile home; (4) there is a leak in the plumbing under the kitchen sink; (5) the kitchen has holes in the floor and one can see the ground through the floor; (6) the unit has insect and rodent infestation; (7) there are leaks in the plumbing and the toilet wouldn't flush; (8) there are electrical deficiencies and failure, no electrical cover plates on the outlets or switches, and light fixtures are broken; (9) the unit is in total disrepair, is not worth repairing and is unfit for human occupancy; (10) the floors under the bathroom cabinets are rotted and unsafe; (11) there is no glass in the bedroom window which has leaking plexiglass. Decision and Order (Unit 2). Esmerelda Araguz, the occupant of Unit 2, testified that: (1) only one of the three electrical sockets in the back bedroom will work at a time; (2) there are no covers on the electrical sockets, only one kitchen socket works, there are no working sockets in the children's bedroom and sparks come out of the receptacles; (3) there are no smoke detectors in the unit; (4) the toilet runs and does not flush properly; (5) the unit is infested with cockroaches and mice; (6) windows don't work and one is broken; (7) the kitchen sink drain leaks badly; (8) there is a hole in the floor under the bathroom sink and can see the ground. *Id.* Plaintiff testified as to Unit 2: (1) "That there are no structural defects in the mobile home and it could be repaired as reported by Century Restoration."; (2) that she recently had an electrical contractor inspect the unit and he found no defects; (3) she recently had a plumbing contractor inspect the septic tank and it was also satisfactory. *Id.*

Based on this testimony, Hearing Officer Derringer determined that Unit 2 was a dangerous and unsafe building that should be demolished and removed for the following reasons: (1) the unit does not comply with the fire code (no fire extinguisher); (2) there are no working smoke detectors in the unit; (3) there are holes in the bathroom floor that need to be properly repaired and maintained so as not to allow rodents or insects access to the unit; (4) the unit is infested with roaches and rodents; (5) the electrical system needs to be repaired so that all receptacles, switches and light fixtures are working properly; (6) the kitchen drain leaks; (7) the unit is not worth repairing and has been substantially destroyed by neglect and deterioration; (8) the estimated costs of repair of the structure will be greater than the value of the unit; (9) the furnace and water heater are in poor condition and pose a fire risk to tenants because of dirty conditions; (10) the unit is occupied by ten persons and is overloaded. *Id.*

In his decision regarding Unit 2, Hearing Officer Derringer found and ordered that: proper notice had been given or waived by all interested parties; plaintiff appears to be the owner of the Unit; and "Based on the evidence submitted, the mobile home . . . commonly known as Unit 2, in Hartford Township, is hereby declared a dangerous and unsafe building as defined by statute (MCL 125.539) and shall be demolished or completely removed from the premises on or before October 1, 2011." *Id.*

### C. Plaintiff's federal action

On October 5, 2011 (four days after the demolition deadlines), plaintiff filed a § 1983 civil rights action against defendants for alleged constitutional violations arising from the proposed demolition of her three mobile homes (identified as nos. 0, 1 and 2), and defendants' "campaign" to destroy eight other mobile homes or trailers owned by her. *See* Compl. (docket no. 1).

10

Specifically, plaintiff alleged that her property was seized without a hearing in a state court proceeding and that she was deprived of her property without due process. *Id.* (docket no. 1 at p. 3). Plaintiff's complaint named the following defendants: Hartford Township; Charles Moore (Building inspector); Ron Sefcik (Supervisor of Hartford Township); James Lechenet; Cecil Derringer (Building inspector); and David Peterson (Hartford Township Attorney). *Id.* Plaintiff has sued defendants Moore, Sefcik, Lechent, Derringer and Peterson in their individual and official capacities. *Id.*[2]

On October 31, 2011, plaintiff amended her complaint, prior to service, to add the following members of the Hartford Township Board as defendants in this action in both their individual and official capacities: Julie Sweet, Kurt Dowd, John McLellen and Vanessa Wilmoth. *See* Motion to amend (docket no. 2); Fed. R. Civ. P. 15(a)(1) (amending as a matter of course). This amendment was intended to supplement the complaint by incorporating acts that occurred at a later

---

[2] The court notes that plaintiff entitled her complaint as a "verified complaint." A verified complaint is considered analogous to an affidavit for certain purposes. *See Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993) (a verified complaint has the same force and effect as an affidavit for purposes of responding to a motion for summary judgment). Title 28 U.S.C. § 1746 authorizes litigants to provide unsworn declarations in lieu of affidavits under oath, providing in pertinent part that such unsworn declaration or verification be subscribed as in writing as true under penalty of perjury, dated, and in substantially the following form:

> (2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)".

28 U.S.C. § 1746. Here, plaintiff's verification did not certify that her statements were "true and correct" under "penalty of perjury" as required by the statute. Rather, she diluted the statutory language by stating "I have read the above complaint and it is correct to the best of my knowledge." Compl. at p. 3. Because plaintiff did not declare that her statements were true under penalty of perjury, the complaint is not verified under 28 U.S.C. § 1746. *See McCaskill v. Ray*, 279 Fed.Appx. 913, 915 (11th Cir. 2008) ("Federal law does provide an alternative to making a sworn statement, but requires the statement include a handwritten averment, signed and dated, that the statement is true under the penalties of perjury. 28 U.S.C. § 1746."); *Peters v. Lincoln Electric Company*, 285 F.3d 456, 475 (6th Cir. 2002) ("Courts are generally consistent in validating documents that were *sworn to under penalty of perjury*, notwithstanding the fact that they were not notarized" )(citing 28 U.S.C. § 1746) (emphasis added).

11

proceeding. On October 5, 2011, defendant Derringer submitted a "Notice of failure to comply with demolition order" to Hartford Township, advising the township that plaintiff had refused or neglected to comply with pursuant to § 125.541, and Hartford Township issued an order to show cause to plaintiff as to Units 0 and 2. *See* Order to Show Cause (docket no. 2-1 at p. 3). After noting that plaintiff had failed to comply with the August 29, 2011 orders, the township scheduled a hearing and special meeting giving plaintiff an opportunity to show cause why the orders to demolish Units 0 and 2 should not be enforced. *Id.*; Excerpt of Minutes of Special Board Meeting (Oct. 25, 2011) (docket no. 2-1 at pp. 1-2). At the meeting, the three township officials present (Supervisor Sefcik, Clerk Sweet and Trustee Dowd) "approved and affirmed" the August 29, 2011 orders and extended the demolition date to November 24, 2011. Excerpt of Minutes of Special Board Meeting. In her amendment, plaintiff alleged: the defendant Sefcik conducted the October 25, 2011 proceedings "in an angry and unprofessional manner, even stating that the Mobile Homes should have been demolished regardless of the fact that the tenants were still residing there beyond Oct. 1, 2011"; that the meeting was held by three Township Board members (defendants Sefcik, Sweet and Dowd); that the purpose of the hearing was to show cause why Units 0 and 2 should not be demolished; and that the Township Board refused to allow the units to remain or be repaired, and ordered them to be demolished on November 24, 2011. Motion to amend (docket no. 2); Excerpt of Minutes of Special Board Meeting.

      After the entry of the second order for demolition, plaintiff filed her second motion for injunctive relief (docket no. 5), seeking a preliminary injunction "to prohibit defendants from demolishing any mobile home during the pendency of this lawsuit." In her (third) motion for injunctive relief (docket no. 28), plaintiff asks the court "to issue permission for another Township

12

to inspect repaired mobile homes #2 & #0 and permit repaired homes to be rented" and "that another Township be permitted to do any necessary business in the future, regarding permits, inspections, etc. as Hartford Township operates with an obvious bias compounded by this pending lawsuit." Motion for injunctive relief (docket no. 28).

## II. Legal Standard for preliminary injunction

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). *See, e.g.*, *Blaylock v. Cheker Oil Co.*, 547 F.2d 962, 965 (6th Cir. 1976) ("[t]he general function of a preliminary injunction is to maintain the status quo pending determination of an action on its merits"). However, "[i]f the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury." *Stenberg v. Cheker Oil Company*, 573 F.2d 921, 925 (6th Cir. 1978) (internal citations omitted).

A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his burden of proving that the circumstances clearly demand it. *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002); *Fort Wayne Women's Health Organization v. Brane*, 734 F.Supp. 849, 850 (N.D. Ind. 1990). In reviewing requests for injunctive relief, the court considers (1) whether the movant has shown a strong or substantial likelihood or probability of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the preliminary injunction will cause

substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *See Rock & Roll Hall of Fame v. Gentile Productions*, 134 F.3d 749, 753 (6th Cir. 1998). The four factors listed above are meant to be balanced as they guide the court in exercising its discretion; they are not due rigid application and need not be assigned equal weight. *In re Eagle-Pitcher Indus., Inc.,* 963 F.2d 855, 859 (6th Cir. 1992). The court's discretion is directed at the weight to be given each factor, and the effect to be accorded their mix. While a court need not consider any single factor as either indispensable or dispositive, neither is it required to conclude that all four support its decision. However, it is well established that "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. National Board of Medical Examiners,* 225 F.3d 620, 625 (6th Cir. 2000). Finally, the movant bears the burden of persuading the court that the factors weigh in favor of granting a preliminary injunction. *Granny Goose Foods, Inc. v Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County,* 415 U.S. 432, 441 (1974).

### III. Discussion

#### A. Likelihood of success on the merits

Defendant Township determined that Units 0, 1 and 2 were dangerous structures pursuant to Michigan's statutory scheme. M.C.L. § 125.540(1) provides that "if a building or structure is found to be a dangerous building, the enforcing agency shall issue a notice that the building or structure is a dangerous building." The notice shall specify the time and place of a hearing on whether the building or structure is a dangerous building. M.C.L. § 125.540(2). At the hearing, the hearing officer shall take testimony of the enforcing agency, the owner of the property, and any interested party. M.C.L. § 125.541(1) "If the hearing officer determines that the building

or structure should be demolished, otherwise made safe, or properly maintained, the hearing officer shall enter an order that specifies what action the owner, agent, or lessee shall take and sets a date by which the owner, agent, or lessee shall comply with the order." M.C.L. § 125.541(2).

        The documents attached to plaintiff's complaint indicate that the Township or its agents: inspected the units; gave notice of a hearing on whether the units were dangerous or unsafe and should be demolished; and took testimony at the hearing from the township inspector, the occupant or former occupant of each unit and plaintiff. The Township duly determined that Units 0 and 2 should be demolished or removed, and that Unit 1 would be demolished if not repaired. Given this record, plaintiff would have no basis for contesting the Township's actions. *See, e.g., Thomas v. City of Detroit*, 299 Fed. Appx. 473 (6th Cir. 2008) (where an owner was afforded the opportunity to appear at a hearing to show cause why the building should not be destroyed and did not comply with the City's order of demolition, it was within the City's statutory right under §§ 125.540 and 541 to enforce the order and assess the costs of demolition against the building's owner).

        With respect to plaintiff's claims she was deprived of property without a state court hearing, the record reflects that plaintiff waived this claim when she failed to appeal the Township's decision to the state circuit court pursuant to M.C.L. § 125.542. Rather than follow the state's statutory mechanism for challenging a local government's decision regarding a dangerous housing issue, plaintiff chose to file a federal civil rights action against the Township.

        Given the Township's record of proceedings and plaintiff's failure to appeal the Township's orders issued pursuant to § 125.541, the court concludes that plaintiff has failed to

demonstrate a strong or substantial likelihood or probability of success on the merits. Accordingly, the court concludes that this factor favors defendants.

### B. Irreparable Injury

The "key word" in determining the extent of an injury sufficient to support the award of injunctive relief is "irreparable." *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991). Mere injuries, however substantial, are not enough. *Id.* Rather, "the harm alleged must be both certain and immediate, rather than speculative or theoretical." *Id.* "In order to substantiate a claim that irreparable injury is likely to occur, a movant must provide some evidence that the harm has occurred in the past and is likely to occur again." *Id.* (internal citations omitted). "As a general rule, a movant has not established irreparable harm where damages would adequately compensate the movant for the asserted harm." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995) (internal quotation marks omitted). "Monetary loss alone will generally not amount to irreparable harm." *Borey v. National Union Fire Insurance Company of Pittsburgh, Pennsylvania*, 934 F.2d 30, 34 (2d Cir. 1991).

Here, plaintiff has represented to the court that if her mobile homes were wrongly demolished, then she could determine an amount of compensatory damages for her loss. In this regard, plaintiff has represented that the values of the mobile homes are readily available on the internet at NADAguides.com. *See* Plaintiff's Brief at p.2, ¶ 6 ("Home #2 holds a NADA manufactured home value of over approx. $9,500") (docket no. 5 at p. 2); NADAguides.com Value Report (docket no. 5-1). In addition, if plaintiff claims that she has lost rental income, then she could obtain a remedy in the form compensatory damages. Furthermore, the Township's order does

not require demolition; plaintiff could remove the trailers and store them elsewhere. Accordingly, this factor strongly favors defendants.

### C.    Substantial harm to others

The documentation reflects that the Township had authority to enforce its housing regulations, that hearings were held, that a hearing officer found violations in Units 0, 1 and 2 which rendered those units dangerous and unsafe buildings under M.C.L. § 125.539, that the Township followed the applicable statutory procedure for making these determinations and that plaintiff did not appeal the Hearing Officer's decisions and orders as provided by the applicable state statutes. By their very existence, these structures, which have been deemed by the governmental authorities to be dangerous and unsafe buildings, have the potential to cause substantial harm to others, whether they are tenants, residents of the mobile home park or visitors to the park. This factor favors defendants.

### D.    Public interest

Plaintiff seeks to maintain the status quo by preventing defendants from enforcing housing violations. Units 0, 1 and 2 are rented to members of the public and are part of a mobile home park. The public has a strong interest in their local government's enforcement of housing regulations designed to protect the public health and welfare. *See, generally, Devines v. Maier*, 728 F.2d 876, 886 (7th Cir. 1984) ("By declaring a dwelling uninhabitable, and issuing an order to temporarily vacate, the City of Milwaukee is performing its regulatory duty to protect the health, safety, morals, and general welfare of the public"). Accordingly, this factor favors defendants.

### E. Evaluation of the four factors

After reviewing the four factors relevant to issuing injunctive relief, the court concludes that all of the factors favor defendants. First, plaintiff does not have a strong or substantial likelihood or probability of success on the merits of her action. Second, plaintiff acknowledges she will not suffer irreparable injury without an injunction, because her injury for the loss of the units and potential lost rent can be remedied by compensatory damages. Third, the issuance of an injunction, which would prevent defendants from demolishing structures found to be dangerous under M.C.L. § 125.539, would cause substantial harm to others. Fourth, the public interest will not be served by interfering with defendants' duty to enforce the state housing law within Hartford Township. For these reasons, the court concludes that plaintiffs' motion for injunctive relief should be denied.[3]

---

[3] The individual defendants (which include township officers, trustees and the township attorney) contend that they are not subject to plaintiff's request for injunctive relief because "Hartford Township, not the individual Defendants, issued the August 29, 2011 Decisions and Orders that are the subject matter of this lawsuit." Defendants' Response (docket no. 42 at pp. 10-11). Although the individual defendants claim that they cannot be subject to an injunction related to the August 29, 2011 orders, they cite no authority to support this claim. Contrary to defendants' assertion, Fed. R. Civ. P. 65(d)(2) provides that an injunctive order binds: "(A) the parties; the parties' officers, agents, servants, employees, and attorneys and; (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)." While the township issued the orders, its officials and agents are responsible for executing those orders and would be held responsible for violating a court order directed at the township. *See, generally, Reich v. Sea Sprite Boat Company, Inc.*, 50 F.3d 413, 417 (7th Cir. 1995) ("A command to the corporation is in effect a command to those who are officially responsible for its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience and may be punished for contempt."), *quoting Wilson v. United States*, 221 U.S. 361, 376 (1911). Because the individual defendants have failed to articulate why they would not be bound by an injunction related to the township's orders, the court deems this argument waived.

**III.     Recommendation**

I respectfully recommend that plaintiff's motions for a preliminary injunction (docket nos. 5 and 28) be **DENIED**.


Dated:  August 20, 2012                             /s/ Hugh W. Brenneman, Jr.
                                                    HUGH W. BRENNEMAN, JR.
                                                    United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).