UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUSAN LYNNE JARVIS-ORR,

          Plaintiff,

vs.

TOWNSHIP OF HARTFORD, *et al.*,

          Defendants.

_____/

Case No. 1:11-cv-1066

Hon. Robert J. Jonker

## REPORT AND RECOMMENDATION

This is a civil rights action brought by a *pro se* plaintiff pursuant to 42 U.S.C. § 1983. This matter is now before the court on the following motions: a motion to dismiss and for judgment on the pleadings filed by defendants Charles Moore, Ron Sefcik, James Lechenet, Cecil Derringer, Julie Sweet, Kurt Dowd, John McClellan and Vanessa Wilmoth (sometimes collectively referred to as the "individual defendants") (docket no. 60); and a motion to dismiss or for judgment on the pleadings filed by defendant Hartford Township (docket no. 62).

### I.    Background

The court previously summarized plaintiff's claims as follows:

### A.    Sewage issues involving Van Buren County

This dispute involves plaintiff's B&J Mobile Home Park (sometimes referred to as the "mobile home park") and her disputes with various local authorities regulating the mobile home park. Compl. at p. 2 (docket no. 1). The background for this dispute appears in the numerous documents attached to the *pro se* plaintiff's complaint. The disputes began as early as August 2, 2010, when the Van Buren/Cass County District Public Health Department ("County Health Department") notified plaintiff via certified mail of an "Order to Comply" which arose from "the discharge of inadequately treated sewage from an unlawful septic system serving the property located at Lot #1 in B & J Mobile Home Park." County Health Department letter (Aug. 2, 2010) (docket no. 1-1 at p. 19). The County went on to state "*Untreated*

*or inadequately treated human wastes can promote the transmission of amebiasis, cholera, encephalitis, meningitis, hepatitis, poliomyelitis, salmonellosis, shigellosis and typhoid fever*." *Id.* (emphasis in original).  The order required plaintiff to repair "the present sewage disposal system with a properly constructed system" within 30 days, provided plaintiff with a sanitation permit application, and advised her that a representative would inspect the sewage system upon receipt of her application.  *Id.* The letter further advised plaintiff that if she failed to obey the order the matter would be referred to the Van Buren County Prosecuting Attorney to initiate proceedings in the Circuit Court for enforcement of the order.  *Id.*

In a letter dated August 12, 2010, the County Health Department advised plaintiff that "[s]ince the allotted time has passed for the noted deficiencies to be repaired," certain trailers were unfit for human habitation under the Van Buren/Cass County Housing Regulations and had been condemned as of August 11, 2010, namely Lots 0, 1, 2, 3, 4 and 5.  County Health Department letter (Aug. 12, 2010) (docket no. 1-1 at p. 20).  The County Health Department ordered the residences to be vacated within two weeks upon receipt of the letter and remain unoccupied "until this office has approved all corrections to the deficiencies."  *Id.*  Then, in a letter dated August 31, 2010, the County Health Department advised plaintiff: that "this department has recognized the required corrections to your rental property," that "this department finds you in compliance with the Van Buren County Housing Regulations," and that the department's Public Health Sanitarian (Brian R. Lint) had "lifted the condemnation of this property."  County Health Department letter (Aug. 31, 2010) (docket no. 1-1 at p. 21).

However, additional disputes arose the following summer.  In June 14, 2011, when the Van Buren/Cass County District Public Health Department issued plaintiff an "Order to Abate Imminent Danger" pursuant to § 2451(1) of Public Act 368 of 1978 (known as the Public Health Code) due to a finding "that an imminent danger to the public health exists through discharge of sewage to the ground surface at B & J Mobile Home Park owned by [plaintiff] on property located in Hartford Township, Van Buren County, [Michigan]."  Order to Abate (docket no. 1-1 at p. 22).  The order was based on the following specified findings:

1.    On June 13th, 2011, as well as on numerous previous occasions, personnel of the Van Buren/Cass Health Department have inspected the sewage disposal system and found that raw sewage was being discharged to the ground surface.

2.    There is a failure of the on-site sewage disposal system serving this mobile home park resulting in the discharge of sewage to the ground surface.

2

3.     The mobile home park has a capacity of ten (10) mobile homes and is occupied at or very near capacity.  There are also a number of homes adjacent to the park.  All of the residents in this area are being subjected to imminent public health hazard by the raw sewage on the ground surface.

4.     That area covered by the ponding of sewage is readily accessible by animals, the residents of the mobile home park and the public, including children.

5.     That the ponding of sewage represents a hazard to the health of the public and to the residents of the mobile home park through the exposure to pathogenic organisms found in that sewage.

6.     There have been numerous meetings, consultations and correspondence between the Van Buren/Cass Health Department, you and your representatives.  To this date, the failure of the sewage system has not been remedied.

Order to Abate (docket no. 1-1 at p. 23).

The attachments to plaintiff's complaint included a job invoice from Pro Plumbing Services, LLC, dated June 20, 2011, which charged plaintiff $115.00 for the following work: "found open sewer line in yard plus [sic] I had installed previously had been removed"; reinstalled [sic] plus found leak had stopped"; "no other sewage in park"; and, "line was in area [sic]."  Pro Plumbing Invoice (June 20, 2011) (docket no. 1-1 at p. 24).  The complaint also included a statement from Baggett & Sons Plumbing Heating & A/C, dated June 23, 2011, which charged plaintiff $80.00 for the following work: "found no problem with septic tank or drain field everything flowing and draining to specs[,] no water above ground drains all open."  Baggett & Sons Statement (June 23, 2011) (docket no. 1-1 at p. 25).

**B.     Hartford Township's investigation and hearing as to whether Units 0, 1 and 2 are dangerous buildings under M.C.L. § 125.539.**

The present action arose when Hartford Township officials followed up on tenant complaints at the mobile home park.  On July 29, 2011, Hartford Township issued a "Notice of Hearing for Order of Demolition."  Notice of Hearing (July 29, 2011) (docket no. 1-1 at p. 2).  The notice provided in pertinent part as follows:

This document is to serve as Notice that a Hartford Township Building Inspector has found violations on the above listed property

3

which render the trailer located thereon dangerous under the provisions of MCL 125.539, copies of which are attached.

The trailer is dangerous under the law because it is unsafe or unlawful because it is a defective and dangerous building pursuant to the statutory definition of "Dangerous or Unsafe Building."

PLEASE TAKE NOTICE that a hearing will be held on whether the building is dangerous or unsafe and should be demolished on:

> Time:  3:00 P.M.
> Date:  August 17, 2011
> Place:  Hartford Township Hall
> 61310 CR 687, Hartford, Michigan

TAKE FURTHER NOTICE  that you will have an opportunity to show cause at the hearing why the hearing officer shall not order the building be demolished, made safe or properly maintained.

Notice of Hearing (July 29, 2011) (docket no. 1-1 at p. 2).

On August 29, 2011, Cecil Derringer (a hearing officer appointed by Hartford Township Supervisor Ron Sefcik), issued three decisions after this hearing with respect to mobile homes identified as Units 0, 1, and 2.  *See* Decision and Order (Unit 0) (docket no. 1-1 at pp. 5-8); Decision and Order (Unit 1) (docket no. 1-1 at pp. 9-13); Decision and Order (Unit 2) (docket no. 1-1 at pp. 14-18).  Each Order listed the violations at the respective unit.

### 1.  Unit 0

The Order for Unit 0 recited the testimony of Charles Moore, the duly appointed Building Official for Hartford Township, who testified that the unit was a dangerous structure as defined by M.C.L. § 125.539 for the following reasons: (1) Health Department worker George Friday requested Moore to follow up on complaints by tenants regarding sewage issues at the park; (2) the mobile home did not meet fire codes (no fire extinguisher); (3) there are no working smoke detectors in the mobile home; (4) there is no vent in the bathroom and the bathroom window does not open; (5) the kitchen has holes in the floor and it is possible to see the ground through the floor; (6) the mobile home has insect and rodent infestation; (7) the toilet does not flush properly; (8) the ground fault receptacle on the kitchen counter does not shut off; (9) "[t]he mobile home is in total disrepair, is not worth repairing and is  unfit for human occupancy"; (10) the drain under the kitchen sink is held together with string; and  (11) the furnace and water heater are very dirty, need to be cleaned and are fire hazards.  Decision and Order (Unit 0).  Yolanda Cruz,

4

the occupant of Unit 0, testified that: (1) only one of the three electrical receptacles in the back bedroom will work at a time; (2) the kitchen electrical socket on the counter does not shut off; (3) there are no smoke detectors in the unit; (4) the toilet did not flush; and (5) the unit is infested with bugs and cockroaches. *Id.* Plaintiff testified as to Unit 0: (1) "That there are no structural defects in the mobile home and it could be repaired. Mr. Dave Varney, Century Restoration, has inspected for structural defects."; (2) that she recently had an electrical contractor inspect the unit and no defects were noted; (3) she recently had a plumbing contractor inspect the septic tank and that it was also satisfactory. *Id.*

Based on this testimony, Hearing Officer Derringer determined that Unit 0 was a dangerous and unsafe building that should be demolished and removed for the following reasons: (1) the unit does not comply with the fire code (no fire extinguisher); (2) there are no working smoke detectors in the unit; (3) there needs to be a mechanical vent or operable window in the bathroom; (4) there are holes in the kitchen floor that need to be properly repaired and maintained so as not to allow rodents or insects access to the unit; (5) the unit is infested with roaches and rodents; (6) the water heater and furnace are full of dirt, lint and cobwebs and pose a fire risk to the structure; (7) the electrical system needs to be repaired so that every switch, receptacle and light fixture are in good working order; (8) the kitchen drain leaks; (9) the cabinets in both the bath and the kitchen are in need of repair; (10) the unit has been substantially destroyed by neglect and deterioration; and (11) the estimated cost of repair of the structure will be greater than the value of the mobile home. *Id.*

In his decision regarding Unit 0, Hearing Officer Derringer found that: proper notice had been given or waived by all interested parties; plaintiff appears to be the owner of the Unit; and "Based on the evidence submitted, the mobile home . . . commonly known as Unit 0, in Hartford Township, is hereby declared a dangerous and unsafe building as defined by statute (MCL 125.539) and shall be demolished or completely removed from the premises on or before October 1, 2011." *Id.*

## 2. Unit 1

The Order for Unit 1 recited the testimony of Charles Moore, who testified that the unit was a dangerous structure as defined by M.C.L. § 125.539 for the following reasons: (1) George Friday requested Moore to follow up on complaints by tenants regarding sewage issues at the park; (2) the mobile home did not meet fire codes (no fire extinguisher); (3) there are no working smoke detectors in the mobile home; (4) there is no lock on the side door of the unit; (5) the floors are in poor condition with actual holes where one can see the ground through the floor; (6) the gas has been shut off, the occupants are or were using unvented gas heaters, and the tenants were unable to get the gas company to open an account; (7) there is no hot water in the unit; (8) the cabinet bases, doors and drawer fronts in both the kitchen and bathroom are in poor condition requiring repair; (9) the floor registers are not

properly attached to the heat ducts leaving gaps for cold air and pests to enter; (10) some windows have been repaired with plastic which has broken and admits both rain and cold air; and (11) the furnace and water heater are both very dirty and will require cleaning.  Decision and Order (Unit 1).  Jesus Cruz, a former occupant of Unit 1, testified that: (1) there was no natural gas service to the unit, resulting in no heat or hot water; (2) the windows leak; (3) raw sewage comes out of the ground near the unit; (4) the toilet did not flush properly; (5) no lawn care was provided; and (6) complaints of bugs and rodents.  *Id.*  Plaintiff testified as to Unit 1: (1) "That there are no structural defects in the mobile home and has a report from Century Restoration that it can be repaired."; (2) that she recently had an electrical contractor inspect the unit and he found no defects; (3) she recently had a plumbing contractor inspect the septic and drain filed and that it was also satisfactory.  *Id.*  Based on this testimony, Hearing Officer Derringer determined that Unit ) was a dangerous and unsafe building: (1) the unit does not comply with the fire code (no fire extinguisher); (2) there are no working smoke detectors in the unit; (3) there is no lock on the side door; (4) there are holes in the floor that need to be properly repaired and maintained so as not to allow rodents or insects access to the unit; (5) the unit must be properly served by a heating system and unvented gas heaters cannot be used; (6) there needs to be hot water in all of the fixtures in the unit; (7) the cabinet doors in the kitchen and bath need to be repaired; (8) the floor registers need to be attached to a working heat duct; (9) the windows need to be properly glazed and repaired so they do not leak; (10) the septic tank and drain field need to be pumped and placed in proper working condition; (11) the furnace and water heater need to be cleaned and verified by licensed contractors to be in proper and safe working order; (12) all electrical receptacles, switches and light fixtures need to be properly installed, complete with cover plates and globes.  *Id.*

In his decision regarding Unit 1, Hearing Officer Derringer found that: proper notice had been given or waived by all interested parties; plaintiff appears to be the owner of the Unit; and that "Based on the evidence submitted, the mobile home . . . commonly known as Unit 1, in Hartford Township, is hereby declared a dangerous and unsafe building as defined by statute (MCL 125.539) but could be made safe and should be properly maintained if occupied."  *Id.*  Hearing Officer Derringer then ordered that Unit 1 "shall be demolished on or after October 1, 2011, unless the owner elects to properly repair and make the mobile home  safe for human occupancy."  *Id.*  Derringer further ordered that "[i]f [plaintiff] refuses or neglects to comply with this Order by October 1, 2011, then these findings and this Order shall be filed with the Hartford Township Board of Trustees on October 6, 2011, and necessary action shall be taken as stated by the above pursuant to the Housing Law of Michigan."  *Id.*

6

### 3.    Unit 2

The Order for Unit 3 recited the testimony of Charles Moore, who testified that the unit was a dangerous structure as defined by M.C.L. § 125.539 for the following reasons: (1) George Friday requested Moore to follow up on complaints by tenants regarding sewage issues at the park; (2) the mobile home did not meet fire codes (no fire extinguisher); (3) there are no working smoke detectors in the mobile home; (4) there is a leak in the plumbing under the kitchen sink; (5) the kitchen has holes in the floor and one can see the ground through the floor; (6) the unit has insect and rodent infestation; (7) there are leaks in the plumbing and the toilet wouldn't flush; (8) there are electrical deficiencies and failure, no electrical cover plates on the outlets or switches, and light fixtures are broken; (9) the unit is in total disrepair, is not worth repairing and is unfit for human occupancy; (10) the floors under the bathroom cabinets are rotted and unsafe; (11) there is no glass in the bedroom window which has leaking plexiglass.  Decision and Order (Unit 2).  Esmerelda Araguz, the occupant of Unit 2, testified that: (1) only one of the three electrical sockets in the back bedroom will work at a time; (2) there are no covers on the electrical sockets, only one kitchen socket works, there are no working sockets in the children's bedroom and sparks come out of the receptacles; (3) there are no smoke detectors in the unit; (4) the toilet runs and does not flush properly; (5) the unit is infested with cockroaches and mice; (6) windows don't work and one is broken; (7) the kitchen sink drain leaks badly; (8) there is a hole in the floor under the bathroom sink and can see the ground.  *Id.*  Plaintiff testified as to Unit 2: (1) "That there are no structural defects in the mobile home and it could be repaired as reported by Century Restoration."; (2) that she recently had an electrical contractor inspect the unit and he found no defects; (3) she recently had a plumbing contractor inspect the septic tank and it was also satisfactory.  *Id.*

Based on this testimony, Hearing Officer Derringer determined that Unit 2 was a dangerous and unsafe building that should be demolished and removed for the following reasons: (1) the unit does not comply with the fire code (no fire extinguisher); (2) there are no working smoke detectors in the unit; (3) there are holes in the bathroom floor that need to be properly repaired and maintained so as not to allow rodents or insects access to the unit; (4) the unit is infested with roaches and rodents; (5) the electrical system needs to be repaired so that all receptacles, switches and light fixtures are working properly; (6) the kitchen drain leaks; (7) the unit is not worth repairing and has been substantially destroyed by neglect and deterioration; (8) the estimated costs of repair of the structure will be greater than the value of the unit; (9) the furnace and water heater are in poor condition and pose a fire risk to tenants because of dirty conditions; (10) the unit is occupied by ten persons and is overloaded.  *Id.*

In his decision regarding Unit 2, Hearing Officer Derringer found and ordered that: proper notice had been given or waived by all interested parties; plaintiff appears to be the owner of the Unit; and "Based on the evidence submitted, the mobile home . . . commonly known as Unit 2, in Hartford Township, is hereby declared a dangerous and unsafe building as defined by statute (MCL 125.539) and shall be demolished or completely removed from the premises on or before October 1, 2011." *Id.*

### C.     Plaintiff's federal action

On October 5, 2011(four days after the demolition deadlines), plaintiff filed a § 1983 civil rights action against defendants for alleged constitutional violations arising from the proposed demolition of her three mobile homes (identified as nos. 0, 1 and 2), and defendants' "campaign" to destroy eight other mobile homes or trailers owned by her. *See* Compl. (docket no. 1). Specifically, plaintiff alleged that her property was seized without a hearing in a state court proceeding and that she was deprived of her property without due process. *Id.* (docket no. 1 at p. 3). Plaintiff's complaint named the following defendants: Hartford Township; Charles Moore (Building inspector); Ron Sefcik (Supervisor of Hartford Township); James Lechenet; Cecil Derringer (Building inspector); and David Peterson (Hartford Township Attorney). *Id.* Plaintiff has sued defendants Moore, Sefcik, Lechent, Derringer and Peterson in their individual and official capacities. *Id.*

On October 31, 2011, plaintiff amended her complaint, prior to service, to add the following members of the Hartford Township Board as defendants in this action in both their individual and official capacities: Julie Sweet, Kurt Dowd, John McLellen and Vanessa Wilmoth. *See* Motion to amend (docket no. 2); Fed. R. Civ. P. 15(a)(1) (amending as a matter of course). This amendment was intended to supplement the complaint by incorporating acts that occurred at a later proceeding. On October 5, 2011, defendant Derringer submitted a "Notice of failure to comply with demolition order" to Hartford Township, advising the township that plaintiff had refused or neglected to comply with pursuant to § 125.541, and Hartford Township issued an order to show cause to plaintiff as to Units 0 and 2. *See* Order to Show Cause (docket no. 2-1 at p. 3). After noting that plaintiff had failed to comply with the August 29, 2011 orders, the township scheduled a hearing and special meeting giving plaintiff an opportunity to show cause why the orders to demolish Units 0 and 2 should not be enforced. *Id.* ; Excerpt of Minutes of Special Board Meeting (Oct. 25, 2011) (docket no. 2-1 at pp. 1-2). At the meeting, the three township officials present (Supervisor Sefcik, Clerk Sweet and Trustee Dowd) "approved and affirmed" the August 29, 2011 orders and extended the demolition date to November 24, 2011. Excerpt of Minutes of Special Board Meeting.  In her amendment, plaintiff alleged: the defendant Sefcik conducted the October 25, 2011 proceedings "in an angry and unprofessional manner, even stating that the Mobile Homes should have been demolished regardless of the fact that the tenants were still

8

residing there beyond Oct. 1, 2011"; that the meeting was held by three Township Board members (defendants Sefcik, Sweet and Dowd);  that the purpose of the hearing was to show cause why Units 0 and 2 should not be demolished; and that the Township Board refused to allow the units to remain or be repaired, and ordered them to be demolished on November 24, 2011.  Motion to amend (docket no. 2); Excerpt of Minutes of Special Board Meeting.

Report and Recommendation at pp. 1-12 (docket no. 137) (footnotes omitted).

While plaintiff's complaint alleged violations under the First, Fourth, Fifth, Eighth,

Ninth and Fourteenth Amendments, the gist of her complaint is summarized as follows:

I claim a denial of equal protection under the Fourteenth Amendment for seizure of my real property without a hearing in a state court proceeding, this is a deprivation of property without due process, violating the Fifth Amendment as well as the Fourteenth Amendment.  In any case, substantial due process does not exist, i.e., there is no valid reason to destroy structurally, electrically and mechanically sound buildings!

Compl. at p. 3 (docket no. 1).

## II.        Defendants' motion to dismiss or for judgment on the pleadings

### A.        Legal Standard

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws.  *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984);  *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996).  To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Defendants seek judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c), which provides that "[a]fter the pleadings are closed – but early enough not to delay trial  –  a party may

9

move for judgment on the pleadings." The standard of review for a Rule 12(c) motion is the same as for a motion under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. *Fritz v. Charter Township of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010).

> To survive a motion to dismiss [brought pursuant to Fed. R. Civ. P. 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

In making this determination, the complaint must be construed in the light most favorable to the plaintiff, and its well-pleaded facts must be accepted as true. *Morgan v. Churchs Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. National Collegiate Athletic Association*, 528 F.3d 426, 430 (6th Cir. 2008).

In resolving motions to dismiss, the court has a duty to construe a *pro se* complaint liberally. *See Haines v. Kerner*, 404 U.S. 519 (1972); *Kent v. Johnson*, 821 F. 2d 1220, 1223-24 (6th Cir. 1987). However, there are limits to the court's "liberal construction" of a *pro se* complaint. For example, the court cannot rewrite a complaint to include claims that were never presented, "conjure up unpled allegations" or "create a claim." *Rogers v. Detroit Police Dept.*, 595 F. Supp.2d 757, 766 (E.D. Mich. 2009). To hold otherwise would require the court to explore all

10

potential claims of a *pro se* plaintiff and transform the district court to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party. *Id.*

### B. First, Eighth and Ninth Amendments

Plaintiff's amended complaint contains allegations which suggest violations of the Fifth and Fourteenth Amendments (i.e., a government taking and violations of due process and equal protection). While plaintiff's amended complaint also asserts violations of the First, Eighth and Ninth Amendments, she makes no allegations in support of these alleged constitutional violations. The court cannot rewrite plaintiff's pleading to create claims which were never presented. *See Rogers*, 595 F. Supp.2d at 766. Accordingly, the court construes *pro se* plaintiff's amended complaint as limited to those claims brought under the Fifth and Fourteenth Amendments.

### C. Plaintiff's claims are not ripe for decision

#### 1. Fifth Amendment – Takings claim

Plaintiff claims that defendants violated her Fifth Amendment rights by taking her property without just compensation. While not explicitly stated in the amended complaint, plaintiff's claim is essentially one for inverse condemnation, i.e., the City's enforcement of the ordinances deprived her of the use of the trailers.[1] "The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth, provides that private property shall not "be taken for public use, without just compensation." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005) (internal citation omitted). Defendants contend that plaintiff's Fifth Amendment takings claim is subject to dismissal because it is not ripe for decision. The court agrees. "Ripeness is a

---

[1] "The phrase 'inverse condemnation' appears to be one that was coined simply as a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." *United States v. Clarke*, 445 U.S. 253, 257 (1980).

11

justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *National Park Hospitality Association v. Department of Interior*, 538 U.S. 803, 807-08 (2003) (internal quotation marks omitted). "The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction[.]" *Id.*

In *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), the Supreme Court explained that the Fifth Amendment's Takings Clause "does not proscribe the taking of property; it proscribes taking without just compensation." *Williamson County*, 473 U.S. at 194. Where a plaintiff has alleged a regulatory taking by a state or local government, a takings claim is not ripe for review unless a property owner has pursued the available state procedures to obtain just compensation and is denied that compensation. *See Braun v. Ann Arbor Charter Township*, 519 F.3d 564, 569 (6th Cir. 2008); *Coles v. Granville*, 448 F.3d 853, 861 (6th Cir. 2006). Thus, if a state provides an adequate procedure for seeking just compensation, the property owner cannot claim a federal constitutional violation until the owner "has used the procedure and been denied just compensation." *Coles*, 448 F.3d at 861, quoting *Williamson County*, 473 U.S. at 195.

In *Williamson County*, the Supreme Court developed a two-step test for determining when an alleged regulatory taking by a governmental entity is ripe for decision in federal court. First, an alleged "taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the

regulations to the property at issue." *Williamson County*, 473 U.S. at 186-87.   The court's

reluctance to examine taking claims until such a final decision has been made is compelled by the

very nature of the inquiry required to determine just compensation and the factors to be applied in

this inquiry.  *Id.* at 190-91.  "Those factors simply cannot be evaluated until the administrative

agency has arrived at a final, definitive position regarding how it will apply the regulations at issue

to the particular land [or in this case property] in question."  *Id.* at 191.  Second, an alleged taking

of a property interest is not ripe, if the state provides an adequate procedure (such as a state cause

of action for inverse condemnation), until the property owner "has used the procedure and been

denied just compensation."  *Id.* at 194-195.   The second aspect arises because "[t]he Fifth

Amendment does not proscribe the taking of property; it proscribes taking without just

compensation."  *Id.* at 194.

   As the Sixth Circuit explained in *Braun*:

> Thus, in order for a plaintiff to bring a takings claim in federal court, he or
> she must first pursue available remedies in state court.  Two issues inform this
> analysis: first, whether the initial decision-maker, i.e. administrative agency, has
> arrived at a "definitive position on the issue that inflicts an actual, concrete injury"
> (the finality requirement); and second, whether the state has denied just
> compensation based on that injury (the remedies requirement).

*Braun*, 519 F.3d at 569.

   Here, plaintiff has alleged that the City's actions resulted in an unlawful taking of her

property amounting to inverse condemnation.  Michigan recognizes a state law action for inverse

condemnation.  *See generally*, *Hinojosa v. Department of Natural Resources*, 263 Mich. App. 537,

548, 688 N.W.2d 550 (2004).  The two elements of an inverse condemnation claim are: (1) that the

government's actions were a substantial cause of the decline of the plaintiff's property's value;  and

(2) that the government abused its legitimate powers in affirmative actions directly aimed at the

13

plaintiff's property. *Id.* at 549. Under the theory of inverse condemnation, the type of governmental action which constitutes a "taking" is not narrowly construed, nor does it require an actual physical invasion of the property. *Id. See Peterman v. State Department of Natural Resources*, 446 Mich. 177, 190, 521 N.W.2d 499 (1994) ("inverse condemnation may occur even without a physical taking of property, where the effect of a governmental regulation is 'to prevent the use of much of plaintiffs' property . . . for any profitable purpose.'"), quoting *Grand Trunk W.R. Co. v. Detroit*, 326 Mich. 387, 392-93, 40 N.W.2d 195 (1949)).

   The allegations and attachments to plaintiff's amended complaint indicate that she has not met the *Williamson County* ripeness requirements. The Township officials determined that Units 0, 1 and 2 were dangerous structures pursuant to Michigan's statutory scheme. The officials made this determination pursuant to: M.C.L. § 125.540(1), which provides that "if a building or structure is found to be a dangerous building, the enforcing agency shall issue a notice that the building or structure is a dangerous building;" M.C.L. § 125.540(2), which provides that the notice shall specify the time and place of a hearing on whether the building or structure is a dangerous building; M.C.L. § 125.541(1), which provides that at the hearing, the hearing officer shall take testimony of the enforcing agency, the owner of the property, and any interested party; and M.C.L. § 125.541(2), which provides that "[i]f the hearing officer determines that the building or structure should be demolished, otherwise made safe, or properly maintained, the hearing officer shall enter an order that specifies what action the owner, agent, or lessee shall take and sets a date by which the owner, agent, or lessee shall comply with the order."

   Taken at face value, the documents attached to plaintiff's complaint indicate that the Township and its agents followed the statutory notice and hearing requirements in making the

determination that plaintiff's structures were dangerous. *See, e.g., Thomas v. City of Detroit*, 299 Fed. Appx. 473 (6th Cir. 2008) (where an owner was afforded the opportunity to appear at a hearing to show cause why the building should not be destroyed and did not comply with the City's order of demolition, it was within the City's statutory right under §§ 125.540 and 541 to enforce the order and assess the costs of demolition against the building's owner). If plaintiff disagreed with the Township's decision, or the procedure used to reach that decision, then she had the right to seek judicial review pursuant to M.C.L. § 125.542, which provides that "An owner aggrieved by a final decision or order of the legislative body or the board of appeals under section 141 [M.C.L. § 125.541] may appeal the decision or order to the circuit court by filing a petition for an order of superintending control within 20 days from the date of the decision." Plaintiff does not allege that she filed an appeal pursuant of the Township's decision pursuant to M.C.L. § 125.542. Rather than follow the state's statutory mechanism for challenging the Township's decision, plaintiff chose to file a federal civil rights action in this court against the Township, its officials and agents. Accordingly, plaintiff failed to meet the finality requirement under *Williamson County*. *See Braun*, 519 F.3d at 569.

Plaintiff's claim also fails to meet the other part of the *Williamson County* ripeness test. Plaintiff's Fifth Amendment claim seeks compensation which is available under a Michigan state claim for inverse condemnation. However, there is no allegation that plaintiff filed a claim for inverse condemnation or otherwise sought just compensation for the alleged taking under state law. Since plaintiff did not seek compensation for the alleged taking under an applicable state procedure prior to filing this federal action, her Fifth Amendment takings claim does not meet the second step of the *Williamson County* ripeness test.

In summary, whether the court considers plaintiff's failure to appeal the Township's decision pursuant to M.C.L. § 125.542 (the finality requirement) or plaintiff's failure to seek compensation under state law (the remedies requirement), the result is the same: plaintiff's federal takings claim is not ripe because she failed to "pursue any available remedies in state court" prior to bringing her federal claim. *See Braun*, 519 F.3d at 569. Accordingly, defendants are entitled to summary judgment with respect to plaintiff's Fifth Amendment takings claim.

### 2. Fourteenth Amendment – Due Process claim

"When an individual is deprived of a protected property or liberty interest, procedural due process generally requires that the state provide a person with notice and an opportunity to be heard before such a deprivation occurs." *Braun*, 519 F.3d at 572. Where a procedural due process claim arises alongside a takings claim, the court reviews the circumstances of the case – particularly the issue of when the alleged injuries occurred – to determine whether the due process claim is ancillary to the takings claim. *Id.* If the due process claim is an ancillary claim, then the *Williamson County* ripeness test applies. *Id.* In *Bigelow v. Michigan Department of Natural Resources*, 970 F.2d 154 (6th Cir. 1992), the Sixth Circuit explained the application of the *Williamson County* ripeness test where a the plaintiff alleged both a takings claim and an ancillary due process claim:

> Until the state courts have ruled on the plaintiffs' inverse condemnation claim, this court cannot determine whether a taking has occurred, and thus cannot address the procedural due process claim with a full understanding of the relevant facts. Furthermore, addressing the plaintiffs' procedural due process claim at this stage of the proceedings would allow future plaintiffs effectively to circumvent the ripeness requirement for takings claims simply by attaching a procedural due process claim to their complaint.

16

*Bigelow*, 970 F.2d at 160.  *See also, Arnett v. Myers*, 281 F.3d 552, 562-63 (6th Cir. 2002) ("[p]rocedural due process and equal protection claims that are ancillary to taking claims are subject to the same *Williamson* ripeness requirements").

Here, plaintiff's takings and due process claims are inextricably intertwined.  She alleged that the lack of due process led to the unlawful taking and that her injuries arose from that taking. In short, plaintiff's procedural due process claim is ancillary to her takings claim and subject to the *Williamson County* ripeness test.  *See Braun*, 519 F.3d at 572; *Arnett*, 281 F.3d at 563; and, *Bigelow*, 970 F.2d at 160.  For the reasons stated in § II.C.1, *supra*, plaintiff's due process claim is not ripe for decision under the *Williamson County* test.  Accordingly, defendants are entitled to judgment on the pleadings as to plaintiff's procedural due process claim.

### 3.        Fourteenth Amendment – Equal Protection claim

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).  "To state an equal protection claim, a party must claim that the government treated similarly situated persons differently."  *Braun*, 519 F.3d at 574. Here, other than to insert the words "equal protection" in her amended complaint, plaintiff sets forth no allegations to support that constitutional claim.  The only conceivable equal protection claim presented by plaintiff's allegations would be made under a "class of one" theory.  *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (recognizing that a successful equal protection claim may be brought by a "class of one," where the plaintiff alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference

17

in treatment).  However, plaintiff does not meet the pleading standard under even a "class of one" theory, because she has not alleged to being treated differently from other similarly situated individuals with no rational basis for the difference in treatment.   Defendants are entitled to judgment on the pleadings as to any equal protection claim.

Furthermore, even if plaintiff could amend her complaint to properly allege a "class of one" equal protection claim, such an amendment would be futile.  Like plaintiff's procedural due process claim, such an equal protection claim would be ancillary to her takings claim and subject to dismissal under the *Williamson County* ripeness test.  *See Arnett*, 281 F.3d at 562-63.

### 4.      Summary

For the reasons stated above, plaintiff's federal constitutional claims against defendants are subject to dismissal for failing to meet the *Williamson County* ripeness test. Plaintiff's amended complaint should be dismissed as to all defendants, including non-moving defendant David Peterson.[2]

### D.      Defendants' other theories for judgment on the pleadings

With the exception of the issue regarding proper service on defendant Moore, defendants' other arguments raised in their motion for judgment on the pleadings have been effectively subsumed by their motion for summary judgment, which unlike their present motions, include facts outside of the pleadings.  *See* Motion for summary judgment (docket no. 150).  If the

---

[2] Although defendant Peterson did not join in these motions, the court's ruling would apply with equal force to plaintiff's claims against him as an attorney or agent of the Township.  "A court may grant a motion to dismiss even as to nonmoving defendants where the nonmoving defendants are in a position similar to that of moving defendants or where the claims against all defendants are integrally related."  *Bonny v. Society of Lloyd's*, 3 F.3d 156, 162 (7th Cir. 1993).

court does not adopt this report with respect to the ripeness issue, then those remaining claims will be addressed in a separate report addressing defendants' motion for summary judgment.

For his part, defendant Moore moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(5) for insufficient service of process.  See Defendants' Brief at pp. 6-7 (docket no. 61). In such cases, the plaintiff bears the burden of proving that proper service was effected.  *Aetna Business Credit, Inc. v. Universal Decor & Interior Design, Inc.*, 635 F.2d 434, 435 (5th Cir. 1981); *Frederick v. Hydro-Aluminum S.A.*, 153 F.R.D. 120, 123 (E.D. Mich.1994).   *See LSJ Investment Company, Inc. v. O.L.D., Inc.*, 167 F.3d 320, 324 (6th Cir. 1999)  ("actual knowledge and lack of prejudice cannot take the place of legally sufficient service").  In resolving a motion to dismiss for ineffective service under Fed. R. Civ. P. 12(b)(5), the court court may construe the motion as a motion to quash service.  *See Young's Trading Company v. Fancy Import, Inc.*, 222 F.R.D. 341, 342-43 (W.D. Tenn. 2004) ("[w]here service is ineffective, a court has discretion to either dismiss the action or quash service and retain the case") (citing   *Haley v. Simmons*, 529 F.2d 78, 79 (8th Cir.1976)).  In this regard, the Sixth Circuit has expressed a preference to treat the first motion for improper service as a motion to quash.  *See Stern v. Beer*, 200 F.2d 794, 795 (6th Cir. 1953) ("if the first service of process is ineffective, a motion to dismiss should not be granted, but the case should be retained for proper service later").  *See also, Daley v. ALIA*, 105 F.R.D. 87, 89 (E.D. N.Y.1985) ("[w]hen the gravamen of defendant's motion is insufficiency of process, however, the motion must be treated as one to quash service, with leave to plaintiffs to attempt valid service").

The record reflects that defendant Moore has never been served in this action. Rather, the summons was returned as unexecuted with the following explanation: "Defendant in Florida per neighbor."  *See* Unexecuted Summons (docket no. 7).  Defendant Moore's counsel filed

an answer on behalf of Moore on December 6, 2011, raising an affirmative defense of insufficient service and noting that he was making a "Special appearance for Charles Moore."  *See* Answer (docket no. 11); Non-document attorney appearance (Dec. 6, 2011).[3]   In her response, plaintiff states that defendant Moore was served by certified mail, having attached a receipt signed by Moore on November 28, 2011.  *See* Response (docket no. 87 at p.2); Certified Mail card (docket no. 87-1).

Fed. R. Civ. P. 4(e) provides that an individual may be served in a judicial district of the United States by, among other methods,  "(1) following the state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made." Fed. R. Civ. P. 4(e)(1).  In addition, Fed. R. Civ. P. 4(l)(1) requires that except for service performed by a United States marshal or deputy marshal, "proof of service must be made to the court  .  .  . by the server's affidavit."   Assuming that plaintiff tried to serve defendant Moore by certified mail, such service is allowed under the Michigan Court Rules, which provide that process may be served on a resident or nonresident individual by either personal service of :

(1) delivering a summons and a copy of the complaint to the defendant personally; or

(2) sending a summons and a copy of the complaint by registered or certified mail, return receipt requested, and delivery restricted to the addressee.  Service is made when the defendant acknowledges receipt of the mail.  A copy of the return receipt signed by the defendant must be attached to proof showing service under subrule (A)(2).

MCR 2.105(A)(1)-(2).

---

[3] The filing of a special appearance is no longer necessary to challenge the validity of service of process. *See Gerber v. Riordan*, 649 F.3d 514, 521 (6th Cir. 2011).  Here, defendant Moore has preserved this issue by raising the issue on motion and as an affirmative defense in his answer. *Id.*

While plaintiff has presented a copy of a signed return receipt addressed for restricted delivery to Charles Moore and dated November 28, 2011, the record does not link this return receipt to the mailing of a summons and complaint.  *See* Return Receipt (docket no. 87-1).  In addition, it is not accompanied by an affidavit establishing proof of service.  In short, plaintiff has not properly served defendant Moore.[4]

### III.    Recommendation

For the reasons set forth above, I respectfully recommend that the motions for judgment on the pleadings filed by the individual defendants (docket. no. 60) and Hartford Township (docket no. 62) be **GRANTED**.

I further recommend that the non-moving defendant, David Peterson, be **DISMISSED** on the same grounds as set forth the motions (docket nos. 60 and 62) and that this action be **TERMINATED**.  If the court does not dismiss this case in its entirety, then defendant Moore's motion to quash should be granted and plaintiff should be given a short period of time to effectuate personal service on this defendant.


Dated:  November 30, 2012                   /s/ Hugh W. Brenneman, Jr.
                                            HUGH W. BRENNEMAN, JR.
                                            United States Magistrate Judge

---

[4] The court notes that had defendant Moore not filed a motion to dismiss for insufficient service at an early stage of this litigation, his participation in the litigation would have resulted in a waiver of that defense.  *See King v. Taylor*, 694 F.3d 650, 660-61 (6th Cir. 2012) (where a defendant engages in voluntary, active and extensive participation in the litigation which indisputably gave the plaintiffs a reasonable expectation that the defendant would defend the suit on the merits (such as participating in discovery, scheduling and motion practice), he forfeited a lack of proper service defense).

21

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).